**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



---

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                              **Plaintiff,**

                    **v.**

JOSEPH P. COLLINS,

                              **Defendant.**

---

**07 CV 11343**

07 CV _____ ( )

**ECF CASE**

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("Commission"), alleges as follows:

## SUMMARY

1.      The Commission brings this Complaint for violations of the federal securities laws by defendant Joseph P. Collins ("Collins"), a partner at the law firm of Mayer Brown LLP ("Mayer Brown") who was a longtime outside attorney for Refco Inc. and its predecessor entity, Refco Group Ltd. (hereinafter, together referred to as "Refco"). In that capacity, Collins substantially assisted Refco in its failure to disclose to investors that a corporation controlled by the company's chief executive officer owed Refco hundreds of millions of dollars. Collins also substantially assisted Refco in its failure to disclose related party transactions that regularly occurred at the end of Refco fiscal periods and in its failure to disclose hundreds of millions of dollars in potential liabilities regularly assumed by Refco over those period-ends.

2.     In the course of representing Refco, Collins learned that an entity controlled by Phillip R. Bennett ("Bennett"), Refco's chairman and chief executive officer, owed the company hundreds of millions of dollars. In addition, Collins also worked on, and oversaw other Mayer Brown attorneys' work on, short-term transactions in which Refco, at the end of fiscal periods, loaned hundreds of millions of dollars to third parties that, in turn, were obligated to loan equal amounts simultaneously to the Bennett-controlled entity. As part of these transactions, Refco assumed potential liabilities of hundreds of millions of dollars, in the form of guaranties and indemnification that it extended to the third parties. The transactions were reversed shortly after the fiscal periods ended.

3.     In August 2004, Collins represented Refco in the acquisition by Thomas H. Lee Partners, L.P. of a majority ownership interest in Refco. The transaction was financed in part by a placement of $600 million in senior subordinated notes. The Offering Circular for the placement failed to disclose the Bennett-controlled entity's indebtedness to Refco or the period-end transactions and potential liabilities. Collins reviewed and edited the Offering Circular. He revised two sections of the document that should have made those disclosures.

4.     In August 2005, Collins represented Refco in connection with its initial public offering of common stock. The Registration Statement that Refco filed with the Commission in connection with that offering also failed to disclose the indebtedness or the potential liabilities. Collins reviewed and edited the Registration Statement. He revised a section that should have made those disclosures.

5.     Refco failed to disclose the indebtedness, period-end transactions, and potential liabilities in its Offering Circular and Registration Statement. The failure to disclose this information resulted in material omissions in those offering documents.

6.     By engaging in this conduct, Collins aided and abetted Refco's violations of the antifraud provisions of the federal securities laws. The Commission requests, among other things, that this Court permanently restrain and enjoin Collins from further violations of the antifraud provisions of the federal securities laws as alleged in this Complaint and impose monetary penalties on him pursuant to Section 21(d)(3) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8.     Collins, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

9.     Certain of the acts, practices, and courses of conduct constituting the violations of law alleged herein occurred within this judicial district.

10.     Collins, directly and indirectly, has engaged in, and unless restrained and enjoined by this Court will continue to engage in the acts, practices, and courses of business alleged herein, or in acts, practices, and courses of business of similar purport and object.

## DEFENDANT

11.    Defendant Joseph P. Collins, 57, resides in Winnetka, Illinois. He joined Mayer Brown (formerly known as Mayer, Brown, Rowe & Maw LLP) in 1994 as a partner, bringing Refco with him as a client from his previous firm. From 1994 to October 2005, Collins was the billing partner for Mayer Brown's representation of Refco and had overall responsibility for the engagement. From 1994 to August 2004, Mayer Brown was Refco's primary law firm, and Collins was Refco's primary outside lawyer. Mayer Brown and Collins continued to represent Refco in a significant capacity from August 2004 to October 2005. Collins was involved in Refco's major corporate transactions, and he interacted directly with the company's senior management, including Bennett. Collins is presently a partner at Mayer Brown and is the head of that firm's derivatives practice group. At all relevant times for this Complaint, Collins worked out of Mayer Brown's offices in Chicago, Illinois and New York, New York.

## RELEVANT ENTITIES AND INDIVIDUAL

12.    Refco Group Ltd. was a Delaware limited liability company with its headquarters in New York City. The company was a major provider of execution and clearing services for exchange-traded derivatives and prime brokerage services in the fixed income and foreign exchange markets. It held regulated commodities and securities brokerages. As part of a reincorporation conducted in preparation for its August 10, 2005, initial public offering of common stock, Refco Inc. became the corporate successor to Refco Group Ltd. After the offering, Refco's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act [15 U.S.C. § 78$l$(b)] and traded on the New York Stock Exchange. On October 10, 2005, press reports appeared discussing hundreds of millions of dollars of undisclosed debt that a Bennett-controlled

entity owed to Refco. On October 13, 2005, the New York Stock Exchange halted trading in

Refco's common stock, and on October 17, 2005, Refco filed for protection under Chapter 11 of

the U.S. Bankruptcy Code. On October 18, 2005, Refco's common stock was delisted. Refco's

fiscal year ended at the end of February.

13.    Phillip R. Bennett joined Refco in 1981. Beginning in September 1998, Bennett

was chief executive officer and president of Refco and chairman of its board of members. After

Refco's August 2005 initial public offering of common stock, Bennett continued to serve as

chief executive officer and chairman of the board of directors. On October 10, 2005, Refco

placed Bennett on an indefinite leave of absence. Bennett subsequently resigned from Refco in

January 2006.

14.    Refco Group Holdings, Inc. ("RGHI") is a closely held Delaware corporation. It

is not, and was not, a subsidiary of Refco. At all relevant times for this Complaint, Bennett

owned a substantial interest in RGHI. From approximately August 1999 to August 2004,

Bennett owned fifty percent of RGHI. Subsequent to August 2004, Bennett completely owned

RGHI. At all relevant times for this Complaint, RGHI held a substantial ownership interest in

Refco.

## FACTS

### Collins' Knowledge of RGHI's Indebtedness to Refco

15.    In 1997, Collins learned that Refco had assumed significant customer trading

losses. In the aftermath of the October 1997 stock market decline caused by the Asian financial

crisis, several customer accounts at Refco experienced large losses. When the customers could

not meet the resulting margin calls, Refco assumed the losses. Collins drafted a series of

5

agreements pursuant to which Refco assumed approximately $100 million of one major

customer's trading losses. Collins learned that Refco had assigned $71 million of those assumed

losses to a subsidiary of RGHI.

16.     In 1999, Collins worked on a transaction pursuant to which Bank für Arbeit und

Wirtschaft ("BAWAG") acquired a ten percent ownership interest in Refco. As a result of that

work, Collins learned that related parties owed Refco at least $250 million. The BAWAG

transaction was subject to review for compliance with the federal Bank Holding Company Act.

In connection with that issue, on October 15, 1999, Bennett sent Collins a letter setting forth

arguments supporting the transaction. Refco's financial statements for its fiscal year ended

February 28, 1999, were attached to the letter. The financial statements showed that Refco held

outstanding loans receivable of approximately $252 million from related parties.

17.     In 2002, Collins worked on a proposed transaction in which he learned that RGHI

was indebted to Refco by hundreds of millions of dollars. Pursuant to the proposed transaction

RGHI would have sold BAWAG fifty-one percent of its voting membership interest in Refco. A

draft purchase agreement dated February 11, 2002, states that a portion of the consideration for

the membership interest would be the purchaser's assumption of $350 million of RGHI's

liabilities.

18.     Collins' hand-written notes dated April 19, 2002, specify that the purchaser's

assumption of liabilities would involve assuming debt that Refco held from RGHI. The notes

state, "Assumption     Purchaser would become the borrower of RGL     replaces loan receivable

from RGHI." ("RGL" denoted Refco Group Ltd.)

6

19.     Although the proposed transaction did not come to fruition, in July 2002, Refco entered into a Proceeds Participation Agreement with BAWAG, pursuant to which Refco conveyed to a BAWAG affiliate the right to receive a stated percentage of the proceeds from a future sale of Refco.  Collins and Mayer Brown represented Refco and RGHI in connection with the Proceeds Participation Agreement.

20.     In mid-2002, Collins was made aware that RGHI had at least $350 million of "inter-company" debt owed to Refco.  In June 2002, Mayer Brown prepared a draft side letter to the Proceeds Participation Agreement.  Collins reviewed and edited the letter.  He also forwarded the letter to BAWAG and to Bennett.  A provision of the draft side letter states that Refco "agrees that $350 million of the Purchase Price for the Participation Right shall be used or caused to be used for the retirement of inter-company debt of Refco Group Holdings, Inc."  That language remained in the final version of the letter.

21.     In 2004, RGHI agreed to sell Thomas H. Lee Partners, L.P. and its affiliates and co-investors ("Lee Partners") a fifty-seven percent ownership interest in Refco.  RGHI kept the remaining forty-three percent.  At the time, RGHI was owned jointly by Bennett and a former Refco executive.  However, a condition of Lee Partners' Refco purchase was that Bennett become RGHI's sole owner.

22.     As of the time of the Lee Partners transaction, Collins knew that RGHI's indebtedness to Refco was $1 billion and that it was contemplated that RGHI's remaining indebtedness after the Lee Partners transaction would be $300 million.

7

**Collins' Knowledge of Refco Period-End Transactions and Potential Liabilities**

23.     In 2000, Collins began working on short-term transactions involving a Refco subsidiary, third parties, and RGHI that regularly occurred immediately prior to Refco fiscal period-ends and that were reversed immediately following the period-ends. From February 2000 through February 2004, the transactions were implemented at the end of each of Refco's fiscal years. Beginning in May 2004, the transactions occurred at the end of each fiscal quarter as well.

24.     In the transactions, Refco Capital Markets, Ltd., an unregulated, offshore Refco subsidiary, loaned a third party (typically, a Refco customer) hundreds of millions of dollars immediately prior to the period-end, and the third party, in turn, loaned an identical amount to RGHI. As part of these transactions, Refco provided the third party with a guaranty of complete payment should RGHI default on its loan obligations. Refco also provided the third party with an indemnification for any claims arising out of the loans. The interest rate on the loan that the third party made to RGHI was slightly higher than the interest rate on the loan that Refco Capital Markets made to the third party. Accordingly, the transactions ensured a profit to the third party. Once the fiscal period ended, the transactions were reversed.

25.     Mayer Brown prepared the documents for these transactions from February 2000 through May 2005. From February 2000 through February 2003, Collins was personally involved in the transactions. On multiple occasions during this time, Collins discussed the transactions with Refco executives. He obtained from Refco the loan amounts, interest rates, loan dates, and counterparty information to be utilized. Collins also discussed the transactions with other Mayer Brown attorneys.

8

26.     For example, on February 1, 2000, Collins obtained from a Refco executive the loan amounts, interest rates, loan dates, and counterparty information for a $150 million transaction involving Refco Capital Markets, a third party, and RGHI that occurred immediately prior to Refco's fiscal year-end of February 29, 2000.

27.     Similarly, on February 12, 2002, Collins again communicated with the Refco executive and received the loan amounts, interest rates, loan dates, and counterparty information for two transactions that Refco Capital Markets and RGHI engaged in with two third parties just prior to Refco's fiscal year-end of February 28, 2002. One of these transactions involved Refco Capital Markets lending a third party $325 million, and the third party, in turn, lending that same amount to RGHI on February 25, 2002. The structure of the other transaction was identical, except that the amount involved was $175 million. Collins' notes of his discussion indicate that the transactions were to be reversed on March 4, 2002, just days after the end of Refco's fiscal year. His notes also referenced the guaranties that Refco provided to the third parties in these transactions.

28.     Collins also communicated with some of the third parties about the period-end transactions. On February 16, 2001, a third party sent Collins a letter outlining its understanding of how the transaction would work. The letter states, in part:

> It is planned that RCM will deposit the loan proceeds in [the third party's] account . . . at RCM on February 23, 2001. [The third party] will then fax a letter to RCM instructing them to move the funds to RGHI with a 15 basis point uplift in the interest rate. RCM will then withdraw the funds from [the third party's] account and deposit the funds to RGHI's account, thereby completing the back-to-back loan transaction. The steps will be reversed on March 6, 2001. RCM will transfer the . . . spread on the transaction to [the third party's] . . . account . . . in the Cayman Islands. The account details are the same as used for the back-to-back loan done in 2000.

9

("RCM" denoted Refco Capital Markets.)

29.     In some instances, Collins prepared, reviewed, and revised the transaction documents. For example, in 2001, Collins revised the loan agreements pursuant to which Refco Capital Markets loaned a third party $200 million on February 26, 2001, and the third party, in turn, loaned an identical amount to RGHI. Collins also revised the guaranty and the indemnification that Refco provided the third party in this transaction.

30.     As a result of Collins' familiarity with the period-end transactions, he knew that, at times, Bennett executed documents on behalf of both Refco and RGHI. On those occasions, Bennett, on behalf of RGHI, would execute the documents pursuant to which RGHI borrowed money from the third party and, on behalf of Refco, would execute documents pursuant to which Refco guaranteed RGHI's loan repayment to the third party.

31.     Even though his involvement diminished over time, Collins was still aware that Mayer Brown was assisting Refco with the period-end transactions in 2004 and 2005. Collins described the transactions that occurred in 2004 and 2005 in summary fashion in the bills for legal services that he sent Refco. Although Collins by that time had delegated primary responsibility for preparing the documents and coordinating the transactions to a Mayer Brown associate, he continued to be kept abreast of the status of the transactions. On May 20, 2005, Collins was copied on an e-mail that the Mayer Brown associate sent to Refco enclosing the documents for loans of $450 million involving Refco Capital Markets, a third party, and RGHI that occurred over the fiscal quarter-end of May 31, 2005. The e-mail also referenced the guaranty and indemnification related to those loans.

### The Lee Partners Transaction

32.     In 2004, RGHI agreed to sell Lee Partners a majority ownership interest in Refco. Collins coordinated Refco's responses to the due diligence that Lee Partners performed for the transaction. In its due diligence, Lee Partners requested information concerning all related party indebtedness, all transactions between Refco and RGHI, and all agreements under which Refco had incurred significant indemnification obligations. Refco failed to provide Lee Partners with information about RGHI's indebtedness or the period-end transactions, including the related indemnification obligations that were in effect over the period-ends.

33.     Collins was also involved in negotiating, structuring, and drafting the Equity Purchase and Merger Agreement that Refco, RGHI, and Lee Partners executed. Several of the representations contained in the agreement were false. The agreement contained representations that Refco did not have any undisclosed liabilities, undisclosed related party transactions, or undisclosed material contracts in which Refco guaranteed indebtedness in excess of $1 million.

### Collins' Role in Refco's False Offering Documents

34.     The 2004 Lee Partners transaction was financed, in part, by the placement of $600 million in senior subordinated notes to three financial institutions pursuant to an Offering Circular. In June 2004 and again in July 2004, Collins reviewed and edited the Offering Circular. As part of his mark-ups of the Circular, Collins reviewed and made some hand-written revisions to the Risk Factors section. The disclosed factors warned potential investors about a myriad of risks, including Refco's indebtedness, cash flow needs, regulatory and legal restrictions, market factors, competition, operational credit risks, regulatory costs and

consequences, litigation risk, intellectual property issues, loss of management members, and controlling members' inherent conflicts of interest.

35.     However, even after Collins' review and revisions, the Risk Factors section did not disclose that, after the Lee Partners transaction, Refco would be owed hundreds of millions of dollars by an entity controlled and owned by Refco's chief executive officer. Nor did the section disclose that Refco periodically assumed potential liabilities of hundreds of millions of dollars, in the form of guaranties and indemnification extended to third parties, with the potential liabilities contingent on the actions of Refco's chief executive officer. Although Collins was aware of the indebtedness and the potential liabilities, his edits to the Risk Factors section disclosed neither. Accordingly, as provided to the purchasers of the senior subordinated notes, the Offering Circular failed to disclose those risks.

36.     As part of his June 2004 mark-up of the Offering Circular, Collins also reviewed and made hand-written revisions to the Certain Relationships and Related Transactions section. As reviewed by him, that section discussed the Equity Purchase and Merger Agreement that would effectuate the Lee Partners transaction, provisions of the limited liability company agreement that governed the issuance of two separate classes of membership units, certain provisions of the Refco securityholders agreement, a management agreement with a Lee Partners affiliate, an agreement to provide certain members of Refco management with nonvoting membership units, and an escrow agreement governing part of the consideration for Lee Partners' acquisition of its majority ownership interest.

37.     However, even after Collins' review and revisions, the Certain Relationships and Related Transactions section failed to disclose that an entity controlled and owned by Refco's

12

chief executive officer owed Refco hundreds of millions of dollars; that Refco regularly entered into transactions over its period-ends in which it loaned hundreds of millions of dollars to a third party that, in turn, was obligated to loan an equal amount simultaneously to an entity controlled by Refco's chief executive officer; or that Refco regularly guaranteed the repayment of, and indemnified third parties from any claims arising from non-payment of, hundreds of millions of dollars in loans owed by an entity controlled by Refco's chief executive officer. Although Collins was aware of these transactions, his edits to the Certain Relationships and Related Transactions section of the Offering Circular left them undisclosed. Because the indebtedness, the transactions, and the guaranties and indemnification involved Refco's chief executive officer (who also held a significant ownership interest in Refco), they were related party transactions. As provided to the purchasers of the senior subordinated notes, the Offering Circular failed to disclose these related party transactions.

38.     In August 2005, Refco conducted its initial public offering of common stock pursuant to a Registration Statement on Form S-1 that the Commission declared effective on August 10, 2005. Collins reviewed and revised several sections of the Registration Statement. As part of an October 2004 mark-up of several sections, Collins made hand-written revisions to the Risk Factors section. Pursuant to the federal securities laws, Refco was required to provide in this section of the Registration Statement a discussion of the most significant factors that might make an investment in Refco common stock speculative or risky.

39.     Although Collins revised a number of risk factors, he did not insert risk factors disclosing that Refco was owed hundreds of millions of dollars by an entity controlled and owned by Refco's chief executive officer, or that Refco periodically assumed potential liabilities

13

of hundreds of millions of dollars, in the form of guaranties and indemnification extended to

third parties, with the potential liabilities contingent on the actions of Refco's chief executive

officer. As provided to potential investors in Refco's initial public offering of common stock,

the Registration Statement failed to disclose the indebtedness or the potential liabilities.

40.     The information regarding the indebtedness, the period-end transactions, and the

potential liabilities was material. The failure of Refco, aided and abetted by Collins, to disclose

the information resulted in material omissions in Refco's offering documents.

### FIRST CLAIM FOR RELIEF

### FRAUD

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)],
and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]**

41.     Paragraphs 1 through 40 are realleged and incorporated herein by reference.

42.     As set forth above, Refco, directly or indirectly, singly or in concert, by use of the

means or instrumentalities of interstate commerce, or by the use of the mails or of the facilities

of a national securities exchange, in connection with the purchase or sale of securities,

knowingly or recklessly, has:  (a) employed devices, schemes, or artifices to defraud; (b) made

untrue statements of material fact, or omitted to state material facts necessary to make the

statements made, in light of the circumstances under which they were made, not misleading;

and/or (c) engaged in acts, practices, or courses of business which operated as a fraud or deceit

upon purchasers of Refco securities and upon other persons, in violation of Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

43.     As detailed above, Collins knowingly or recklessly provided substantial

assistance to Refco in the commission of these violations.

44.     By reason of the conduct described above, Collins aided and abetted Refco's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

A.     Permanently restraining and enjoining Collins from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5];

B.     Imposing civil monetary penalties on Collins pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

C.     Granting such other relief as this Court may deem just and appropriate.

Dated:  Washington, D.C.
        December 17, 2007

                                          Respectfully submitted,


Robert B. Blackburn (RB 1545)            James A. Kidney (JK 5830)
Local Counsel                            Scott W. Friestad
                                         David Frohlich
Securities and Exchange                  Stephen E. Jones
  Commission
3 World Financial Center                 Counsel for Plaintiff
Suite 400                                Securities and Exchange Commission
New York, N.Y. 10281-1022                100 F Street, N.E.
(212) 336-1050                           Washington, D.C. 20549-4030
                                         (202) 551-4441 (Kidney)
                                         (202) 772-9246 (Kidney fax)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK\

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br>          Plaintiff,<br><br>                    *v.*<br><br>JOSEPH P. COLLINS,<br>          Defendant. | 07 CV _____(_____)<br><br>ECF CASE |

## ATTACHMENT TO CIVIL COVER SHEET

### Statement of Related Cases Pursuant to Local Rule 1.6(a)

Plaintiff Securities and Exchange Commission (the "SEC") submits this statement to note actions filed in this district that may be related to the case at bar:

***In re Refco, Inc. Securities Litigation,*** No. 05-CV-8626 (GEL), filed October 11, 2005 - pending.

***United States v. Phillip R. Bennett, Robert C. Trosten and Tone N. Grant****,* 05 Cr. 01192 (NRB), filed November 10, 2005 - pending.

***SEC v. BAWAG P.S.K. Bank für Arbeit und Wirtschaft und Österreichische Postsparkasse Aktiengesellschaft,*** 06 CV 04222 (DC), filed June 5, 2006 (settled concurrent with filing the complaint).

***Thomas H. Lee Equity Fund V, L.P. et al v. Mayer Brown***, No. 07-CV-6767 (GEL)**,** filed  July 26, 2007 – pending.